Good morning, Honourable Justices. I am representing Mr. Plenty Faplant, Jane Mininger. And Jane Mininger is not here because he just had, three days ago, a very serious surgery. He is in bed. I have to bring to the attention of the Honourable Justices. There was a, I said that in my brief, Dr. Joseph Bernstein, Dr. Joseph Bernstein, the defendant of this evaluating physician, was commenting on the South Cylindro, I mean, South, Health South, Cylindro-based fractional capacity evaluating organization. Actually, that was a mistake. Dr. Joseph Bernstein was commenting on the job hardening which took place around Mills Peninsula Hospital in 1998, around 1998, from 1998 to 2000, that had correction in mind. I will go into my oral argument. I would like to treat the heart of the issue in this case is whether the defendant ably abused their discretion and whether there was inherent conflict of interest in this case. Actually, the district court admitted that there was apparent conflict of interest because the Mills Peninsula Hospital is both the source funding and administrator and Hartford Insurance Company is representing the Mills Peninsula Hospital. The issue which was in here is whether there was inherent conflict of interest. I believe there is an inherent conflict of interest because the doctors who actually, whose opinion was taken into consideration is simply Dr. Perry Dunn, who is Hartford's medical director, her opinion, and Dr. Wagner is another one who is also an independent medical documents evaluator. Both of them have never treated my client, they have never examined my client, they have never evaluated my client, but their opinion is heavily, heavily taken into consideration. And the decision which was made terminating my client's long-term disability benefits in July, on July 17, 2002. Both of them, let's take one by one. First, Dr. Perry Dunn, the medical director of Hartford. Hartford Insurance Company is the agent of Mills Peninsula Hospital. And what she was, the opinion of the doctors whom she has been taking with, first the treating doctor, the only treating doctor is Dr. Paul Lind, a well-known orthopedic surgeon around the Bay Area. And she, as a whole, as your Honorable Justices have looked, she rejected the whole treating doctor's opinion that Mr. Manager is not able to do any kind of work, including... No, your Honor, yes, you are right, but... took Dr. Lindquist's views into consideration, is that right? Yes, they took into consideration, they rejected, but the idea that Dr. Lindquist only looked into, I mean, his opinion was not only the 1992, 1998 opinion. He comes, they ask him in 2000, and then he gives his opinion again in 2000. That is, A, 297 to 300, AF, the documents submitted by defendant appellant from AF 297... So in 2000, he repeated his opinion? Yes, and again, your Honor, again he repeated, in 2002, after Dr. Alan Zakaria... I'm sorry, in 2002? Also, two, three times, your Honor. One, as you have said, in 1998. Second, after Dr. McCormick have looked at him and took his x-rays, he commented again in 2000. Again, in 2002, that is, AF 97, the documents by defendants, after the last doctor looked into him. In 2000, it's AF 97, your Honor, if you don't have, I can submit that document. That is, Dr. Paul Lindquist was the last doctor to see Mr. Gene Manager. Maybe it was not submitted to you, maybe I have the document with me. When did Dr. Lindquist cease treating your client? He treated, starting from 1997, right after the injury, through to 2002. And then the last time he sees him is on September, no, 99, 2002. That is document AF 097. He sees him again and he confirms again. He even used his percussion hammer to test whether he has any kind of pain. He says that there is very serious tenderness. He even could not be able to move. And then he commented on Dr. Alan Zakaria's, what happened when Alan Zakaria evaluated Gene Manager. At that time, on that day, that is April 24, 2002, when Dr. Alan Zakaria was evaluating Mr. Manager, Dr. Alan Zakaria used his percussion hammer to test when he was flexing down. And then he fell on the ground. That was not included. And I think that is a very important document, Your Honor. And I did not include that, unfortunately. I found it later in the document which is submitted in support of summary judgment. And if it's missing, I can produce that document. The other one is Dr. Joseph Bernstein's opinion. Dr. Joseph Bernstein has never said that Gene Manager is capable of performing light sedentary work. What he commented was when Dr. Paul Linguist referred him to Dr. Bird's neurosurgeon, Dr. Bird said that he can be retrained and rehabilitated and he can go to the light work, but not to the original work. Then Dr. Paul Linguist came back and said, you are wrong and you are not right because this patient is heavily injured and seriously injured. He cannot do anything. Then he was referred to Joseph Bernstein, the evaluating doctor. And actually his opinion is to my view, I believe, that is a very strong opinion on behalf of my client. He said that Dr. Booth, your consideration that he is going to be able to do some work is not correct. If at all he is going to join any labor market, he must have a very serious training, a vocational training, very serious training, including psychological and treatments. That's what he said. And he said, and he stressed, Gene Manager has dyslexia, a learning problem. He cannot be able to read. It is one of his fears. He said he is a very kind person, he is very cooperative, and he is not going to be able to go back to his work. The third one is Dr. Perry Blackman is a psychologist evaluator. She said she diagnosed him with five disorders and then she recommended a treatment. She recommended six weeks multidisciplinary treatment and she said within that six months, he must be treated five days a week. And she even warned that if he is going to be normal, he must be seriously taken into consideration. She said he has physical pain, physical injury, which is not properly treated. He has psychological and emotional problems, very serious and a deep one. They have never cited, and she has never said he is capable of working sedentary and light sedentary work as he is. Never. The last one is Dr. Alan Zakaria. Dr. Alan Zakaria, his evaluation is, I have a very serious problem with evaluation. In his x-rays, he says that, he reads like an MRI, he says that there is a problem, even though small, at L5 and S1. Then he goes down, he says, in an impression, he is suffering from anular disease, degenerative anular disease, which he did not diagnose. When you look at Dr. Perry Dunn's MRI reading, which she has never taken, but she was reading the MRI which was taken in 1997 and in 2000 by Dr. McCormick, and she says the radiology studies conclude that he has a degenerative anular disease. She says the radiology studies establish that. Nowhere. She didn't cite anything. Nobody reads that. I'm just surprised a doctor, a professional of this stature, is telling something out of the blue, which nobody, no doctor, stated. Dr. Wagner tried to call Dr. Lindquist, three times apparently, and Dr. Lindquist did not return her calls. You say that's because Dr. Wagner is not qualified, and so Dr. Lindquist did not want to talk to her. How do you know that? I didn't talk to Dr. Paul Lindquist. I talked to Dr. Paul Lindquist, yeah. How do you know that he didn't want to talk to her because she wasn't qualified? When I talked to the secretary, anyway, the secretary said she's not qualified. But the issue is, the issue is that Dr. Wagner didn't have that, doesn't justify that. She should just conclude something. That's not in the book. Nobody diagnosed her. And then he is taking the position within Dr. Alan Zakaria's statement is impression reading of the MRI simply taken from Dr. Per Don, who is the director of the Heart Force. And let me come to the South Surrender Occupational. That test was done only almost one and a half. And that paper and that documents, you can find on our website at page AF 172 to 175, I think. And there are a number of tests there. And the manager did not finish most of them, especially the cardiovascular conditioning and the physical conditioning. At that time, the test established that he was undergoing a very painful situation. That's 8 to 9 to 10. And in spite of that, they concluded that he can do a light sedentary work, which is, that work is done by physical therapy. NPT, physical therapy, that's not done by a doctor. No doctor is involved in that test. And simply, it's a matter of measurement. And I will reserve some of the minutes for Reverend Arnold. Thank you. May it please the Court. Good morning, Your Honors. Dennis Rahlstedt, a subject with deed at Moreno & Arnold for defendant in half L.E. Hartford Life Insurance Company. The record demonstrates substantial evidence supporting Hartford Life's reasonable determination that Mr. Manager was not precluded by his medical condition from performing a sedentary or light duty occupation. The evidence in the file includes not only Dr. Wagner's independent review of medical evidence, Dr. Zacharias' IME, with a review and an examination. There's a functional capacity examination, whereby the claimant was put through a battery of tests to see what his true functionality was. There was Dr. de Ohm's medical record review. All of these materials... Who's Dr. Paul Lindquist, and how do we pigeonhole him? Okay, Dr. Lindquist was the primary treating physician of the claimant. In what period of time? Oh, he started... the earliest records we have are from 1998. The last record we have in the administrative record, all of which has been submitted to you, is 2002. Yeah, in your brief you seem to try to indicate that the last time he had anything to say was in 1998. What we're referring... You give no suggestion whatsoever that he continued to be the treating physician, and you give no suggestion whatsoever that it was as late as in 1992. He was still... new information dated September 9, 2002, from Dr. Lindquist. What? I mean, you try to sort of shuffle this off as so old that we don't have to pay any attention to it, but my point is Lindquist was still involved as late as September 2002. Oh, that's absolutely right, and I agree. Our briefing before the district court was much more extensive, and in fact the district court judge was under no misimpression. She noted at her own footnote five that Dr. Lindquist treated plaintiff every few months through 2002, as we had set forth in our motion for summary judgment. My point is the primary treating physician, who was still active at the time when these benefits were denied, has a different opinion than everybody else. That is true. And doesn't that suggest that maybe we ought to impose a greater standard of review on this case than ordinary? No, for two reasons. At least two reasons. Number one, because the existence of conflicting information in the administrative record does not show a need for heightened standard. That is that there's an actual or serious conflict of interest. In fact, it's assumed that particularly under discretionary review, but under all review, just because doctors disagree over time does not mean that someone is entitled to benefits. So long as there is information in the record, and I would say here there's substantial information in the record supporting the decision, that's sufficient. So this court has determined that conflicting information alone is neither sufficient to change the standard of review from discretion or to show an abuse of discretion. Moreover, the U.S. Supreme Court, of course, in Norton, Black, and Decker, said that there is no treating physician rule now applicable to ERISA. The treating physician rule is only applicable to Social Security, has no import in ERISA, and a treating physician need not be given any deference. Certainly, he should be considered, and I would submit that Dr. Lindquist was considered. Dr. Lindquist's records were reviewed by the reviewing physicians and by Dr. Zachariah. Ultimately, that one opinion of Dr. Lindquist, even through 2002, was not ignored by Hartford Life, but was rejected, in particular based upon Dr. Wagner's report. Dr. Wagner looked at this material from Dr. Lindquist and rejected it herself, saying, well, there's nothing here but an impression based upon a statement of the claimant himself. There's no other testing. There's no other diagnosis that would explain or show or furnish any proof of what he's complaining about. So what, in your view, what do we look at? What are we constrained to look at when we decide whether a more searching standard of review is applicable? At this point, what you look at is whether or not you could look at whether or not there's any medical information on which the decision could be based other than Dr. Lindquist, and see if that determination is reasonable. The only time it would change the standard of review is if we did not, for instance, Hartford Life did not even consider this information and had no other information upon which to base this decision. For instance, if the insurer or other claims administrator rejected the treating physician out of hand and had no other information to support his determination, absolutely, then there could be a change in the standard of review. That is not near what happened in this case. If you've got information in the record that was considered by the claims administrator, even though some of it is contradictory, then the administrator is still entitled to have its discretion as provided for in the insurance policy and the plan in this case. And I believe that the recent case of Abbate, Your Honor, also goes to answer a lot of these questions. I submitted that additional citation to this Court for its consideration. Is there anything in the record explaining why Dr. Lindquist didn't respond to Dr. Wagner's inquiries? There is nothing known from the record. There's nothing known why additional medical information was not submitted on appeal by the claimant with the exception of the sole page from Dr. Lindquist from a 2002 examination. That's the only additional information. We know nothing more about Dr. Lindquist. Why he didn't respond to Dr. Wagner, and there's no further reports of Dr. Lindquist writing or not explaining that he disagreed with Dr. Wagner, and here's why. There's nothing from Dr. Lindquist from that point. Is there some reason that the July 17th letter does not include the 2002 statement from Dr. Lindquist? I don't know. What I do know, Your Honor, is what Abbate has now held. This Court says that the claims administrator need not write a treatise, need not specifically refer to every single piece of evidence in the file. That's not possible. That's an unreasonable burden, particularly here where the claims administrator, Hartford Life, said they relied upon the record as a whole, including all of these materials. And I think Hartford Life went ahead and listed up approximately 20 particular pieces of material, which is going above and beyond, but they need not refer to every single piece. However, it's certain that they did indeed consider these materials, particularly since Dr. Lindquist's notes were given to both reviewing physicians, were given to Dr. Zachariah. Dr. Wagner specifically referred to them. I did want to address the 1998 part, Your Honor, and I apologize if we certainly did not mean to mislead this Court. What we're referring to is the appellant specifically referred to his brief to a belief that Hartford Life had ignored certain materials, and he specifically referred to these 1998 notes as having been ignored. That was the purpose of our reference to those 1998 notes, to state that no, these notes were not ignored, that indeed these notes had been specifically given to these reviewing physicians to look at. When I first read your brief without getting into the record, it gave the impression that Lindquist hadn't been involved with this for years before the decision was made. That's our – and we apologize for that misimpression, Your Honor. Could you clarify one point for me? That is, in the July 17, 2002 letter, they list all the information that they rely upon, Hartford says. The first item is treatment notes per Dr. Lindquist dated 5-14-98. It goes through 11-8-01. Oh, yes. There seems to be, in response to your queries by Judge Trott, additional notes, but they don't seem to be reflected. The 2002 note was submitted with the appellant's appeal letter, and so Hartford did not have it at the time of that initial letter. Hartford only received it subsequently. I see, 9-0-9-0-2. Right, and that was not received until with the appeal note. I believe that that particular document is in the supplemental excerpts of record at approximately page 202. This is where he said that Dr. Lindquist, because of the level of trouble he's having, he is probably not employable. That's right, probably not employable. I don't know if that's a strong statement anyway, but certainly I believe that Hartford Life, certainly under law, properly objected to that based upon all the other information Hartford Life had in the file. Then in December 11, when they denied the appeal, they referenced Dr. Lindquist, September 9, 2002. Yes. Again, there's other stuff earlier in the file that would also support the ultimate decision. Dr. Baez, from the other physician originally, who said that he can't do any heavy lifting, but he should be retrained to do something else. I mean, that's his own occupation. Those aren't the other occupations that he can now do allowed under the insurance policy after the two-year ONOC period. It's any occupation, and he's got, in order to be entitled to benefits at this point, the appellant, Your Honor, has to be precluded from performing any other work or occupation that he is or could be qualified under by training, experience, or education. Thank you. Thank you, Your Honors. Thank you, Smith. Honorable, I have only one point to stress, and that is the functional evaluation at South Health that is done by MPT. I don't know what that means. It's the physical therapy that I was told. That is the first time when the statement which says that gene manager can do a light sedentary work, and that was adapted by Dr. Alan Zakaria. And Dr. Alan Zakaria was, they made it purposely to send that evaluation to Dr. Alan Zakaria. Dr. Alan Zakaria, as you have pointed out, he did not include the fact that my client failed during the evaluation. When he was using the percussion hammer to test, which is the very test every doctor or orthopedist uses, whether somebody is seriously injured or not, he did not include that. That is a very suspect. And more than that, I would like to stress the fact that the district court, for reasons I cannot understand, failed to look into the doctor's report and simply relied on the declaration of the defendant's attorney of record. And that, if you go through, by now I'm sure you have read that summary judgment. I was really embarrassed because all the courts are not going to look on the documents and instead are going to accept the declaration of the attorney of record and where is going to be the justice to be rendered in court. That is a very serious and a serious flaw of the district court. And that misrepresentation is carried by Dr. Perry Dunn and Dr. Wagner to the court by the district, by the attorney of record. And simply a physical therapist determines the destiny of one worker. And simply the doctor adopts it. And when most important serious reports are redacted by the defendant, most important progress are taken to their advantage and the most important facts are redacted, which is to the advantage of my client, that is my serious trouble. And especially the report by Joseph Bernstein, Dr. Joseph Bernstein, which I respect, and Dr. Perry Blackman, the evaluating doctor, psychologist evaluator, she diagnosed him seriously. Even if you read on AF 308 in her words, she said a warning, this guy is going to be lost unless you take a very serious step. He is diagnosed with five disorders, psychological disorders. And she established that he has a physical pain too. And this guy must be seriously treated. That was all that is taken, disregarded. And only the opinion of physical therapist is taken. And all these doctors, Dr. Perry and Dr. Wagner, they have never treated my client. They have never examined. They have never evaluated. Simply their role was redacting the most important contents of the doctors. Thank you, Your Honor. I submit. We appreciate your arguments. The matter will be submitted.
judges: Trott, T.G. Nelson, Paez